**THODE et al. v. COE, Com'r of Patents.**
**Civ. No. 11586.**

District Court of the United States for the District of Columbia.

Feb. 9, 1943.

Cushman, Darby & Cushman, of Washington, D. C., by John J. Darby and C. Willard Hayes, both of Washington, D. C., for plaintiffs.

W. W. Cochran, Sol., and Robert F. Whitehead, United States Patent Office, both of Washington, D. C., for defendant.

MORRIS, Justice.

This is a proceeding brought under the provisions of Revised Statutes, Section 4915, U.S.C.A., Title 35, Section 63, with respect to certain rejected claims in an application by the plaintiffs for the reissue of patent No. 2,047,525, granted to the plaintiff Adolf Thode on July 14, 1936. The plaintiff Behr-Manning Corporation is the assignee of the entire interest of Thode, who was and is a citizen of the German Reich. Of the claims in the application for a reissue of said patent, certain of them were allowed and others rejected. Of those claims rejected, which were the subject of these proceedings, certain have been dropped, and the relief here sought are those designated in the complaint as numbers 49, 50, 63, 66, 77, 78, 83, 86, 89, 90, 91 and 92.

To better understand the nature of the claims here involved and the conflicting contentions of the parties with respect to them, it is necessary that there be an understanding of the original patent, application for which was filed September 19, 1932. The title to the original patent is "Insulating Method for Electric and Thermo-Technical Purposes, and Apparatus for Accomplishing the Same." A preliminary statement in the patent points out the then existing method for the insulation of electric conductors by what was known as a whipping method, by which such conductors are whipped with yarns produced from textile materials, and which was very complicated and time consuming. Such statement further points out a proposed method of using flaky, fibrous material which, with the aid of special devices, is applied "on to the conductors" as a dielectric or insulative coating. By this method the flaky material is moved in a continuous, uniform eddy by a circulating air current, which current conveys the flaky material to cylinders which supply it to the wire to be insulated, and which has been previously coated with gum. By means of the adhesive gum the flocks stick on the wire, distributed as uniformly as possible over the entire length and circumference of the same. It is then pointed out that such method has the difficulty that the flocks cannot be brought on to the conductors so uniformly that the diameter of the insulation is the same at all points of the wire surface in that the speed at which the blowing on to the "sticky conductor" by an air current is limited because, if too great, the fibers which have already stuck on the wire might be torn away, especially as to fibers designed not to stick directly on the conductor but on fibers already covering the conductor. It is then stated that the method, according to the present invention, avoids all the inconvenience of the commonly applied methods.

"It is based on the fact that bodies with similar electric charge ( + or — ) repel one another, whereas bodies with opposite charge attract one another. The method is characterized chiefly by the use of high-voltage electric currents for opening and distributing insulating material of any kind.

"These currents are further used for applying the insulating material on to the electric conductors. The individual fibres and particles of the material are electrically charged through the pole of a high voltage source so that they deposit on bodies, which are connected to the opposite pole of the high voltage source. The arrangement may be made so that the bodies to be insulated are grounded and that the other pole of the high voltage source is grounded also.

"The insulating of the conductor according to this method is carried out much more rapidly (about 25 times as rapid) than the hitherto employed method, and it permits of the simultaneous insulating any desired number of conductors in one operation, which may all be the same diameter or of different diameters. The insulating layer obtained in this manner is of uniform thickness on all points of the conductors, and it is possible to regulate the thickness of the insulating layer as desired, as the method is carried out in an undisturbed atmosphere, as will be hereinafter explained.

"An apparatus employed for carrying out the new method is diagrammatically illustrated by way of example in the accompanying drawing, in which:

"Fig. 1 is a side elevation and

"Fig. 2 a top plan view.

"Fig. 3 shows a section of a conductor covered, fox-tail like, with insulating material, the covering being not yet smoothed.

"Fig. 4 shows a fragmental vertical section of an upper portion of a modified form of the apparatus."

The illustrations referred to are reproduced as follows:

"A sputtering electrode 8 projects from below into the container 5 and represents one pole of the high voltage source. The conductors 4 to be insulated pass through the container 5, and any number of conduc-

July 14, 1936.                     A. THODE                     2,047,525
INSULATING METHOD FOR ELECTRIC AND THERMO-TECHNICAL
PURPOSES, AND APPARATUS FOR ACCOMPLISHING THE SAME
Filed Sept. 19, 1932

Fig 1

Fig. 3

Fig. 2

Fig. 4

Inventor.
Adolf Thode

A detailed description of the apparatus and the method is set forth, but only such parts as seem to be critical to the action on the reissue claims now in controversy need be mentioned here:

tors are grouped around the sputtering electrode 8 at a suitable distance from the same. * * * Insulation smoothing devices 10 are mounted on the cover plate 6, one for each conductor 4, these being de-

signed to smooth the insulating material adhering to the conductor as the conductor passes through the center bore thereof. The smoothing devices are rotatively driven from a motor 11. * * *

"The insulating material in the container is electrically charged by the influence effect of sputtering electrode 8 connected to the high voltage source. This charging with electrons of similar polarity effects a further loosening of the insulating material as the individual particles repel one another, according to the law that bodies of similar electric charge repel one another. * * * The particles are thereby thrown against the adhesively coated conductors 4 to be insulated which are conducted through the container at a suitable distance from the sputtering electrode 8. These conductors, being grounded, or connected to the other pole of the high voltage source, attract with high velocity the ionized particles of insulating material. These particles, shot against the bare conductors, cover the same in foxtail-like formation. The foxtail-like coverings are then smoothed as they are drawn through the smoothers 10. The conductors are then perfectly insulated."

The method of applying the adhesive is then discussed, and the statement made that it it not absolutely necessary to coat the conductors with adhesive, as the particles of the insulating material adhere well to the conductors when the current has been cut off, "as, owing to the high speed at which they flow towards the conductors, they intermix and become matted so that they form a dense cover." It is then pointed out that the thickness of the insulating layer can be regulated very accurately and in a simple manner by varying the strength of the electrical potential. "A further possibility of regulation consists in altering the speed with which the conductors pass through the container 5 filled with electrically loaded fibres and along the sputtering electrode 8. At higher speed the layer of insulating material becomes thinner and it becomes thicker at lower speed. Another possibility of regulation is to regulate or alter the quantity of fibres fed into the container in a unit of time. * * * In order to attain a uniform distribution of the insulation over the entire circumference of conductors, that is also on the side of the same turned away from the sputtering electrode 8, driving gears of known type, not shown on the drawing, are provided, which

effect the speed of rotation of the conductors." And closing the specifications are two statements, as to which there has been considerable discussion in connection with the reissue claims now under consideration:

"According to this method not only wires or strands, but also shaped elements of any form can be insulated.

"High voltage direct current as well as alternating current can be used."

Then follows twenty-four claims as to method and apparatus, each one of which in terms refers to the insulation of an "electrical conductor" or "a conductor," and in none of which does there appear any description of such method or apparatus more enlightening on the questions here involved than appears in the disclosures already noted.

Turning now from the original patent to the claims now under consideration, sought to be allowed as a reissue of the original patent, all of them seek such broadening of the original claims that the method and apparatus be not limited to the insulation of electrical conductors, but shall cover a method of and apparatus for "coating foundation material with flocks," "attaching a coating of flocks to a backing," "coating a backing with flocks," "coating a body with flocks," "producing a pile-surfaced sheet material," or "forming pile-surfaced material." Certain of the claims, in addition to altering the limitations above mentioned, provide for the use of alternating current as distinguished from the teaching in the original patent that "high voltage direct current as well as alternating current can be used;" and certain others of the claims, also in addition to altering the limitations above mentioned, describe "an electrode having an active portion of substantial length in the direction of movement of the body [being coated], the body being moved close to and past said electrode," or "an extended electrode at such point and located with respect to the guiding devices so that the electrode is longer in the dimension parallel to the backing than is its distance from the backing," thus altering the description of the "sputtering electrode 8" in the specifications of the original patent.

The Examiner rejected claims 49, 50, 63, 66, 77, 78 and 83 on the following grounds:

1. That applicant, in his original specifications, disclosed only the method and

apparatus for applying insulation coatings to conductors, and, therefore, the original patent showed absolutely no intention to secure the invention set forth in such claims.

2. Applicant's device would be absolutely inoperative for the purpose intended, if the object being coated is not a conductor of electricity.

3. That the claims are unpatentable over certain prior patents.

The Examiner rejected claims 86, 89, 90, 91 and 92 on the grounds one and two above stated. The Board of Appeals of the United States Patent Office approved the Examiner's action on grounds one and three, but disagreed with ground two, allowing one of the claims then rejected on that ground, which, of course, is not included in those here under consideration. The Board of Appeals stated, with respect to applicant's apparatus being operative only when the object to be coated is a conductor of electricity, that "the electrode cooperating with electrode 8 might be positioned on the opposite side of element 4, and an electro-static field created to cause the flock to accumulate on this element whether it be a conductor or not." The Board of Appeals, agreeing with the Examiner, considered that the description of the electrode, in so far as it undertook to alter the original description of the sputtering electrode 8, "is deemed a matter of design." Neither the Examiner nor the Board of Appeals discussed the claims in so far as they related to the use of alternating current instead of the original teaching of either high voltage direct or alternating current, such claims being rejected on the grounds above mentioned.

The question here is not whether an original patent should be granted respecting the claims here involved. It is whether or not these claims may be allowed in a reissue of an original patent, and that question is to be answered in the affirmative, if they come within Section 4916 of the Revised Statutes, as amended, 35 U.S. C.A. § 64: "Whenever any patent is wholly or partly inoperative or invalid, by reason of a defective or insufficient specification, or by reason of the patentee claiming as his own invention or discovery more than he had a right to claim as new, if the error has arisen by inadvertence, accident, or mistake, and without any fraudulent or deceptive intention, the commissioner shall, on the surrender of such patent and the payment of the duty required by law, cause a patent for the same invention, and in accordance with the corrected specification, to be reissued to the patentee or to his assigns or legal representatives, for the unexpired part of the term of the original patent. * * * no new matter shall be introduced into the specification, nor in case of a machine patent shall the model or drawings be amended, except each by the other; * * *."

There was filed with the application for the reissue an affidavit by Adolf Thode, the patentee and assignor of the original patent, stating that such original patent was " * * * partly inoperative by reason of an insufficient specification for the reason that the claims are unnecessarily limited to coating a conductor and to coating a wire conductor which might be interpreted as meaning a good conductor of electricity, whereas almost all substances conduct electricity to some extent and high tension electrical effects may be induced on poor conductors with substantially the same results, so far as coating is concerned, as in the case of good conductors such as metals, and the specification and claims fail clearly to point out that which is inherent in his invention and manifest from a study of his specification and drawings that other things besides electric wires can be coated with flocks, flaky material, or fibrous material * * *." He further stated that, being a citizen of Germany at the time of his original application, and not familiar with all the requirements of patent law in the United States, it was difficult for him to follow the prosecution of the application through all its stages, which was handled by his patent attorney; that in Germany a wide range is given of equivalents; and that his original German application, fairly translated, would cover his invention in all its aspects and phases, and would comprehend the claims now being applied for.

The Supreme Court, speaking recently through Mr. Justice Roberts, in the case of United States Industrial Chemicals, Inc., v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 62 S.Ct. 839, 843, 86 L.Ed. 1105, stated, in connection with the validity of a reissued patent: "The question is whether, in the light of the disclosures contained in the two patents, they are for the same invention. This court has said that they are if the reissue fully describes and claims the very invention intended to be secured by

the original patent; if the reissue describes and claims only those things which were embraced in the invention intended to have been secured by the original patent; if the broader claims in the reissue are not merely suggested or indicated in the original specification but constitute parts or portions of the invention which were intended or sought to be covered or secured by the original patent. The required intention does not appear if the additional matter covered by the claims of the reissue is not disclosed in the original patent. If there be failure of disclosure in the original patent of matter claimed in the reissue, it will not aid the patentee that the new matter covered by the reissue was within his knowledge when he applied for his original patent. And it is not enough that an invention might have been claimed in the original patent because it was suggested or indicated in the specification. It must appear from the face of the instrument that what is covered by the reissue was intended to have been covered and secured by the original." In that case the original patent had disclosed and secured a process for the production of ethylene oxide by bringing oxygen and ethylene together in the presence of a catalyst under certain conditions, and which process directed the introduction of water. It was stated that the oxygen might be that of the atmosphere, and in the reissue the process was altered because it was found that the moisture in the atmosphere eliminated the necessity for the introduction of water. The lower courts, upon expert testimony taken, considered the two processes the same because *chemically the same,* but the Supreme Court did not, stating, 315 U.S. at page 678, 62 S.Ct. at page 844, 86 L.Ed. 1105: "It is inadmissible to enlarge the scope of the original patent by recourse to expert testimony to the effect that a process described and claimed in the reissue, different from that described and claimed in the original patent, is, because equally efficacious, in substance that claimed originally. If such testimony could tip the scales on the issue of the validity of a reissue, it would always be possible to substitute any new combination of steps or elements or devices for the one originally described and claimed by proving that the omission of any one or more steps would not alter the result."

In the instant case, notwithstanding the use of the term "thermo-technical purposes" in the title, and the statement that "shaped elements of any form" as well as wires or strands can be insulated, the whole of the descriptive matter and the language of the claims relate to the insulation of an electrical conductor. To accomplish the coating with flaky or fibrous material by the method or process described in the claims under consideration would require a distinct alteration of the original disclosures. It might indeed be *electrically the same* to position the electrode opposite to the sputtering electrode & behind a sheet of material to be coated with the flock, but it would be distinctly different from that which was claimed or taught in the original invention. It is difficult to see how such a step in the electro-static field is of less significance than the voluntary introduction of water in the ethylene oxide chemical situation where moisture was present through the use of atmosphere regardless of such introduction of water. Much has been said at the hearing to the effect that any pile fabric or sheeting has within itself some measure of heat insulation. It simply is not acceptable to assimilate that sort of thing to the processes and apparatus disclosed by the original patent. The statute providing for the reissue of patents is not intended to extend a patent which has been granted to new fields and new processes not originally in contemplation, and which have been revealed by mechanical development and experimentation subsequently. That is quite clearly the case here, and the limitations in the original patent that the coated body must be an electrical conductor may not be enlarged by a reissue patent.

With respect to the contention of plaintiffs that those claims should be allowed which show an advantageous use of an alternating current, it is insisted that at an earlier stage in the patent office this element of such claims was disposed of adversely notwithstanding there has subsequently been action by the patent office allowing a like claim in similar circumstances under an application for a patent of which the plaintiff Behr-Manning Corporation is not the owner. Whatever may have been the circumstances of the claim not now before the Court, the teachings of the original patent here are that either type of current, direct or alternating, would serve the purposes of the invention. It surely could not be asserted by a reissue of that patent that there was a teaching and

an intention to claim that an alternating current would produce a pile coating or surfacing which a direct current would not do. Even if the claims under consideration involving this feature were not vulnerable on the ground that they enlarge the claims otherwise, they would not be proper in a reissue patent.

■ It is further asserted by plaintiffs that the original invention here discloses a long sputtering electrode. No claim was specifically made dealing with its description or inherent advantages. It is asserted that, with respect to this feature, the Examiner and Board of Appeals disallowed the claims relating thereto on the ground that "the shape of the electrode is deemed a matter of design," and this notwithstanding the allowance of a claim in a subsequent patent, not here involved, that a length-wise electrode as distinguished from the theretofore employed transverse electrode is invention. Again, without regard to the claim in the patent not now before the Court, and considering only this feature as a proper claim for a reissue of the original patent that is before the Court, it appears from the drawings, particularly figure 3, that it is contemplated and shown that the flock accumulates with increasing density on the conductor as it proceeds along the length of electrode 8. No specific claim is made in the patent that the longitudinal position of this electrode 8 serves the purpose of building up the coating, which could not be accomplished by an electrode positioned transversely to the conductor being coated. Indeed the specifications rely upon variation in the strength of the electrical potential and an alteration in the speed with which the conductor being coated is passed through the container to regulate the thickness of the insulating layer. It is true, as the Examiner and Board of Appeals say, that the shape of the electrode is a matter of design, but if such design inherently accomplishes something which it would not if designed differently, it seems to me that it presents a situation in which relief might well be sought under the reissue statute. In the situation now being considered, there is no new element in the original invention, no changing of position of elements to produce an end different from that contemplated by the original invention, but there is a result inherent in the design shown which could not be accomplished by a different design. Whatever virtue there may be,

however, in the claims relating to this feature, such claims are so inextricably involved with other features therein that they cannot be allowed.

■ The plaintiffs insist that what was intended to be secured by the original patent may be determined by recourse to his original claims rather than by reference to the invention as set forth and described in the original patent. Claim No. 1 in the application for the original patent is typical of the original claims: "1. An insulating method for electric or thermo-technical purposes, consisting in electrically charging the individual fibres and particles of the insulating material through one pole of a high voltage source, so that they deposit on bodies which are connected to the other pole of the high voltage source."

The meaning of the term "the same invention," as used in the reissue statute has been the subject of much controversy. "But the Supreme Court put a period to the controversy in the case of the Parker & Whipple Co. v. Yale Clock Co., 123 U.S. 87 [8 S.Ct. 38, 31 L.Ed. 100]. That decision adopted the last of the above stated constructions, and thus established the meaning of the phrase 'the same invention' to be whatever invention was described in the original Letters Patent, and appears therein to have been intended to be secured thereby. This rule has been repeatedly reaffirmed and reapplied by the Supreme Court." Walker on Patents, Deller's Edition, Vol. 2, Sec. 310. That the question is still at rest is made very clear in United States Industrial Chemicals, Inc., v. Carbide & Carbon Chemicals Corp., supra. It will be noted, however, that even in claim No. 1 above mentioned, it is contemplated that the deposit of the insulating material be on bodies which are connected to the other pole of the high voltage source.

■ In the view taken, there is no occasion to consider the disallowance of certain of the claims upon the ground that they are not patentable over the prior art. The only significance which the references to the prior art have in the case, as it is now postured, is that the applicant in the original patent, by his attorney, may well have considered it desirable to so limit the disclosures and claims, which finally found expression in the original patent, that asserted collision with the prior art could more effectively be avoided. Be that as it

may, the claims under consideration must be compared to the invention as described in the original patent and what appears therein to have been intended to be secured thereby for the purpose of determining the sameness of invention.

For the reasons stated, the relief sought cannot be granted, and the complaint is dismissed.